### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**

    **Plaintiff/Respondent,**

    **v.**

**JOSE RIOS-MORALES,**

    **Defendant/Petitioner.**

**Case No. 14- 20117-02-JAR**

### MEMORANDUM AND ORDER

This matter is before the Court on Petitioner Jose Rios-Morales's Motion to Vacate and Discharge with Prejudice Under 28 U.S.C. § 2255 (Doc. 165).  In his motion, Rios-Morales seeks relief on grounds that he was denied effective assistance of counsel.  The government timely responded and submitted an affidavit of trial counsel.[1]  After careful review of the record and arguments presented, the Court denies Rios-Morales's § 2255 motion without an evidentiary hearing.

**I.       Procedural History**

On November 20, 2014, Rios-Morales and co-defendant Felipe Sifuentes were charged in a one-count Indictment with knowingly and intentionally possessing and attempting to possess with the intent to distribute more than 50 grams of methamphetamine.[2]  On January 21, 2015, both defendants were charged in a two-count Superseding Indictment with knowingly and intentionally possessing and attempting to possess with the intent to distribute more than 50 grams of methamphetamine (Count One) and conspiracy to possess with intent to distribute and

---

[1] Doc. 179.

[2] Doc. 14.

to distribute more than 50 grams of methamphetamine (Count Two).[3]  In March 2015, while this case was pending, Rios-Morales, Sifuentes, and nine other co-conspirators were charged with drug trafficking conspiracy violations.[4]  Rios-Morales then proceeded to trial, with Sifuentes entering into a plea agreement with the government.  On October 14, 2015, Rios-Morales was convicted by a jury on both charges.  This Court sentenced Rios-Morales to 292 months' imprisonment, at the bottom of the advisory Guidelines range, on each of Counts 1 and 2, to run concurrently.  On December 28, 2017, the Tenth Circuit Court of Appeals affirmed Rios-Morales's conviction and sentence.[5]  This timely § 2255 motion followed.[6]

## II.      Facts of the Case and Trial Proceedings

The drug conspiracy in this case involved Rios-Morales, his brother Omar, and co-defendant Sifuentes.

### *Detective Brent Kiger's Expert Testimony*

At trial, the government's first witness was Detective Brent Kiger, a task force officer with the Drug Enforcement Administration.[7]  The government called Detective Kiger as an expert in the field of drug trafficking investigation and controlled substances to establish the modus operandi of drug traffickers, explain the value of methamphetamine quantities and purities, and describe the general aspects of narcotics investigations.  The Court recognized and accepted Detective Kiger as an expert after he discussed his experience investigating drug

---

[3] Doc. 23.

[4] *See United States v. Sifuentes-Cabrera*, 15-20020-JAR (D. Kan. 2015).

[5] *United States v. Rios-Morales*, 878 F.3d 978 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 1712 (2018).

[6] 28 U.S.C. § 2255(f).

[7] *See* Trial Tr. at 29.  The transcripts of the jury trial consist of seven volumes found at Docs. 89 through 95, and collectively consist of 1250 sequentially paginated pages.  For convenience, the Court cites to these documents collectively as "Trial Tr." followed by a reference to the page number in the transcript that appears in the upper right corner of each page.

trafficking crimes and his extensive education and training relating to drug trafficking crimes in general and methamphetamine in particular.[8]

### The Conspiracy

Sifuentes, who entered into a plea agreement with the government and testified in the hope of receiving a reduced sentencing, was a key witness for the government.  Sifuentes testified that he began selling methamphetamine in 2011 or 2012.  In 2013 or 2014, he stopped selling methamphetamine because he could not repay his suppliers a large sum of money and they would no longer provide him methamphetamine on credit.[9]  In mid-2014, however, Rios-Morales told Sifuentes that his brother Omar could supply him with methamphetamine on credit.[10]  Sifuentes and Omar never met in person, but Rios-Morales arranged for them to speak on the phone.[11]  Sifuentes agreed to pay Omar $6,200 per pound of methamphetamine.[12]  Sifuentes would give the money to Rios-Morales to send to Omar.[13]  Sifuentes also agreed to pay Rios-Morales $300 per pound as his cut.[14]

Omar's associates in California sent three shipments of methamphetamine to a Missouri address—the home of Sifuentes's friend, whom Sifuentes knew as "Chabacano."[15]  Sifuentes paid Chabacano for the arrangement.[16]  Sifuentes instructed Omar to mail the fourth shipment to

---

[8] *Id.* at 46.

[9] *Id.* at 983.

[10] *Id.*

[11] *Id.* at 984–85.

[12] *Id.* at 986.

[13] *Id.* at 987.

[14] *Id.* at 986–87.

[15] *Id.* at 989.

[16] *Id.*

Sifuentes's home address.[17]  This package, however, was intercepted by postal inspectors.[18]
Over the phone, Sifuentes told the postal inspectors that he knew nothing about the package and
gave them permission to search the package.[19]  The postal inspectors never contacted him
again.[20]  Worried by the incident, Sifuentes told Rios-Morales that they could no longer send
methamphetamine via mail.[21]

Three to four months later, Omar contacted Sifuentes to tell him that he had a new plan:
hide the methamphetamine in a car in California and transport the car to Kansas on a commercial
car hauler.  Sifuentes discussed the plan with Rios-Morales, who "asked if [they] could do this
for the last time" because "he wants to go on vacation to Mexico and he doesn't have any
money."[22]  Sifuentes and Rios-Morales agreed to proceed with the plan.[23]

While the car was in transit in Canadian County, Oklahoma, law enforcement officers
noticed a white Chrysler Sebring on a car hauler.[24]  The vehicle appeared suspicious to the
officers because it was in poor condition and older than the other vehicles on the hauler.[25]  With
the car hauler driver's consent, the officers searched the vehicle.[26]  The officers found several
pounds of methamphetamine inside, packaged in eleven bundles.[27]  The officers followed the car
hauler to Kansas, where the driver made a recorded phone call to the number listed on the bill of

---

[17] *Id.* at 993.

[18] *Id.* at 994.

[19] *Id.* at 995–96.

[20] *Id.* at 996.

[21] *Id.*

[22] *Id.* at 999.

[23] *Id.*

[24] *Id.* at 367–68, 370–71.

[25] *Id.* at 367–68.

[26] *Id.* at 374.

[27] *Id.* at 379

lading.[28]  Sifuentes answered the phone and spoke with the driver.  Rios-Morales's address was listed as the delivery address on the bill of lading, but the driver told Sifuentes that the parking lot of Rios-Morales's apartment complex was too narrow for the car hauler to safely maneuver in and suggested that they meet in a nearby commercial parking lot instead.[29]  After paying the car hauler driver, Sifuentes removed the California license plate from the vehicle and replaced it with a Kansas license plate.[30]  He then drove the vehicle to Rios-Morales's apartment complex.[31]  Once in the parking lot, Sifuentes began searching through the vehicle.[32]  Officers then arrested him.[33]

Sifuentes agreed to cooperate and told the officers that the methamphetamine in the vehicle was intended for his friend, Rios-Morales, who lived in the apartment complex.[34]  Sifuentes made a recorded call to Rios-Morales, who was at work, to let him know that the car arrived.  He told Rios-Morales that the car had a flat tire, that he put the keys under the floor mat, and that he left the car unlocked.

Other officers surveilled Rios-Morales's workplace and followed him when he left work.  Rios-Morales drove southbound on the K-7 state highway and then turned into a Wal-Mart parking lot.[35]  Instead of stopping at the Wal-Mart, he continued driving to an outer road, then made a few more turns to end up back on southbound K-7 again.[36]  The officers believed he was

---

[28] *Id.* at 285.

[29] *Id.* at 285–86.

[30] *Id.* at 492.

[31] *Id.* at 494.

[32] *Id.* at 495.

[33] *Id.*

[34] *Id.* at 497–98.

[35] *Id.* at 817–20.

[36] *Id.* at 820.

conducting a counter-surveillance heat run.[37]  As he neared the apartment complex, Rios-Morales again engaged in what the officers believed was a counter-surveillance tactic by driving past the complex to a near shopping center, and then driving back to the parking lot.[38]  After parking, Rios-Morales immediately walked to his apartment without stopping to look at the car Sifuentes had left unlocked.[39]

Sifuentes made several recorded calls to Omar and Rios-Morales.  Eventually, Sifuentes told Rios-Morales that he would meet him in the parking lot.  An officer drove Sifuentes there in Sifuentes's car.[40]  Sifuentes walked toward the car and Rios-Morales came out of his apartment to meet with him.  Sifuentes then showed Rios-Morales a sample of the methamphetamine.[41]  Rios-Morales told Sifuentes to hide the sample because it was too dangerous.[42]  The officers then arrested both men.[43]

### Fed. R. Evid. 404(b) Evidence: Three California Trips

Before trial, Rios-Morales filed a motion for early notice of Fed. R. Evid. 404(b) evidence,[44] seeking disclosure of Rule 404(b) evidence that the government intended to present at trial.  In response, the government filed a notice pursuant to Rule 404(b) and motion in limine to admit evidence of Rios-Morales's involvement with Sifuentes in an earlier conspiracy to

---

[37] *Id.* at 829.

[38] *Id.* at 514–15.

[39] *Id.* at 853–54.

[40] *Id.* at 531–32.

[41] *Id.* at 1041.

[42] *Id.* at 1042.

[43] *Id.*

[44] Doc. 42.

possess and distribute methamphetamine.[45]  The Court granted the motion in part and denied the

motion in part.[46]  The Court held, in pertinent part:

> The government is allowed to elicit testimony from []
> Sifuentes that he was engaged in a prior drug conspiracy in 2012
> and 2013 which [sic] he purchased drugs from suppliers in
> California, and traveled to California to receive, package and mail
> the drugs to Kansas.  The government will be allowed to elicit
> testimony from [] Sifuentes that his friend [] Rios-Morales
> accompanied him on his trips to procure the drugs in California,
> assisted him and was compensated by Sifuentes for this.  The
> government is allowed to elicit testimony from [] Sifuentes that by
> late 2013 or January 2014, due to economic, legal or other reasons,
> he was no longer able to deal with his prior suppliers and that
> Rios[-Morales] introduced Sifuentes to his brother Omar, leading
> to the formation of the conspiracy as charged in this case.
> The government is not allowed to offer other evidence of
> phone conversations, surveillance, law enforcement activity, or any
> other type of evidence beyond what the Court describes above.[47]

In light of the Court's ruling, the government elicited testimony from Sifuentes at trial

about Rios-Morales's involvement in the earlier conspiracy, with an instruction that this

evidence was admitted only to prove Rios-Morales's knowledge, motive, and opportunity in the

charged conspiracy.[48]  Sifuentes testified that, as part of the earlier conspiracy, he and Rios-

Morales made three trips to California in 2012 and 2013 to pick up methamphetamine from

suppliers, package it, and mail it back to Kansas.  He testified that he paid Rios-Morales between

$2,000 and $2,500 per trip for driving to California with him and assisting him in packaging and

mailing the drugs.[49]  He further testified that Rios-Morales knew that the purpose of these trips

---

[45] Doc. 50.

[46] Doc. 55.

[47] *Id.* at 13–14.

[48] Doc. 83, Instr. 26.

[49] Trial Tr. at 957–58.

was to obtain drugs.[50]  On the first two trips, Sifuentes testified, they packaged the drugs at their hotel and shipped them to Sifuentes's home in Olathe, Kansas from a FedEx across the street of the hotel.  On the third trip, they arrived in California later than planned due to car issues.[51] After they picked up the drugs at a fast-food restaurant, Sifuentes packaged them in the car while Rios-Morales drove, and they shipped the package to Sifuentes's home, again via FedEx.[52]

On their drive back to Kansas from their third trip, Rios-Morales and Sifuentes were pulled over by law enforcement officers in Oklahoma, who searched the vehicle.[53]  While they waited in the back of the police car, Sifuentes testified, they had a conversation about how "this was going to be our last time.  If we got out of this one, we would not go back to California."[54] The police ultimately let them go.

Sifuentes and Rios-Morales stopped traveling to California, and Sifuentes soon ran into financial difficulties.  Dealers Sifuentes had sold drugs to on credit were unable to pay their debts, which, in turn, prevented him from paying his own debts to his suppliers.[55]  As described above, Rios-Morales then initiated the conspiracy at issue in this case by introducing Sifuentes to a new supplier, his brother Omar.

**In Camera** *Juror Interviews*

On the fifth day of trial, the Court informed the parties that one or more of the jurors spoke to a court security officer and the courtroom deputy about a man they observed in the juror

---

[50] *Id.* at 958.

[51] *Id.* at 971–72.

[52] *Id.* at 972–73.

[53] *Id.* at 974–75.

[54] *Id.* at 976.

[55] *Id.* at 983.

parking lot looking at parked vehicles the previous evening.[56]  After hearing from both parties about how they believed the issue should be handled, the Court followed trial counsel's suggestion to conduct individual *in camera* interviews with each juror to determine whether the jurors had been tainted.[57]

In these *in camera* interviews, the Court learned that a female juror, who was one of the last to leave, noticed a man in a red pickup truck as she walked to her car.  He stood out to her because everyone wore blue that day to support the Kansas City royals in the World Series playoffs, but he was dressed in red.[58]  His behavior struck her as suspicious because he slowed down as he drove past her and stared at her.[59]  She saw another juror in the parking lot, sitting in his car, but he said he had been checking emails and did not notice the man.[60]  The female juror then flagged down another juror in the parking lot and asked if he had noticed the man in the red pickup truck.[61]  He said, "No, just take a different route home."[62]  She joked that nobody was paying attention to their surroundings and said that the juror parking lot "shouldn't necessarily be highlighted or have notification that this is where jurors are."[63]  He suggested again that she simply take another route home, and they both left.[64]

---

[56] *Id.* at 1113.

[57] *Id.* at 1114–22.

[58] Doc. 141 at 15–16.

[59] *Id.* at 16.

[60] *Id.*

[61] *Id.* at 17.

[62] *Id.*

[63] *Id.*

[64] *Id.*

As the male juror was leaving, he saw the man driving the red pickup truck in the parking lot "driving along very slowly" and looking at the parked cars.[65]  The juror decided to follow the driver until he was able to take a photo of the truck and its license plate number.  He said that his only concern was "any type of intimidation or repercussions to members of the jury and/or family or anything like that."[66]  He was not particularly concerned; he just wanted to have a record of the truck's license plate in case something did happen.[67]

The next morning, the two jurors who observed the truck told several other jurors about the incident.  The male juror did not mention his concern about possible juror intimidation or repercussions, but the other jurors who participated in this conversation all reported that the female juror said she felt uncomfortable by the incident and "it just didn't seem to fit right."[68]  Some of the jurors said they already had general safety concerns in this neighborhood and noted it was "not the wisest thing" to have the jurors park in a marked parking lot.[69]  But no juror expressed any concerns about the man in the pickup truck being potentially linked to Rios-Morales or anyone else involved in this case.  The female juror who first observed the man in the parking lot said that she reported the incident not because she felt threatened, but because she "just felt that moving forward . . . that parking lot probably should not have a notification that this is where jurors park."[70]

The Court agreed with the jurors that it might be more appropriate to have the jurors park in an unmarked parking lot and told them that the Court would move the jurors to a secure lot in

---

[65] *Id.* at 5–6.

[66] *Id.* at 6–7.

[67] *Id.* at 9–10.

[68] *Id.* at 11.

[69] *Id.* at 21.

[70] *Id.* at 18–19.

the interim.  The Court also said a court security officer would escort the jurors as a group to their cars, as had been done in the past, simply to ensure everyone got to their cars safely after dark, and not because of any particular threat.[71]  The Court asked a few of the more concerned jurors if these measures would allay their concerns, and they said yes.[72]

After completing the *in camera* juror interviews, the Court reported to the parties that the jurors expressed general concerns about the marked parking lot and about crime in the area but said they had no reason to believe the man was related to this case.[73]  The Court said it believed the jury was not tainted because no juror felt threatened or concerned about service on this particular case, and moving the jurors to a secure lot resolved any remaining concerns.[74]  Trial counsel then said that, based on the Court's summary of the *in camera* juror interviews, he had no objection to continuing with the trial with these jurors.[75]

### *Jury Instructions*

After the parties rested their cases, the Court read the jury instructions and the jury deliberated.  During deliberations, the jury submitted a question to the Court: "We need to know what intent to possess and intent to distribute means in regards to Count 1, if physically possessing is necessary for this to be true."[76]  The jury instructions defined "possession with intent to distribute," providing that "[t]o 'possess with intent to distribute' means to possess with intent to deliver or transfer possession of a controlled substance to another person, with or

---

[71] *Id.* at 25, 32–33.

[72] *Id.* at 26, 33.

[73] Trial Tr. at 1127.

[74] *Id.* at 1126–27.

[75] *Id.* at 1128.

[76] Doc. 84.

without any financial interest in the transaction."[77]  The instructions, however, did not define the term "possession" itself.  Nevertheless, the parties agreed that the instructions answered the jury's question, and the Court proposed the following response: "Your question is answered in the instructions on Count 1 and some related instructions.  You must consider the instructions as a whole, and follow that guidance."[78]  The parties approved the response, and the Court sent it to the jury.  The jury submitted no additional questions to the Court.  The next day, the jury returned a guilty verdict on both Counts One and Two.

### *Affidavit of Trial Counsel*

The government submits the affidavit of trial counsel Gregory Robinson, who represented Rios-Morales in the underlying criminal proceedings.[79]  Robinson agrees with Rios-Morales that he did not request advance notice of Detective Kiger's expert testimony pursuant to Fed. R. Crim. P. 16(a)(1)(G).[80]  He also agrees that he did not file a motion for a *James* hearing prior to trial,[81] but he states that "trial strategy required the admission of [certain] outside conversations and telephone calls as necessary components to show jurors that the government's timeline of events was inaccurate and that there was another person or other persons involved other than [Rios-Morales]."[82]  For this reason, Robinson also did not "make a contemporaneous objection to" certain out-of-court statements under Fed. R. Evid. 801(d)(2)(E).[83]

---

[77] Doc. 83, Instr. 12.

[78] Doc. 84.

[79] Doc. 179-1.  *See United States v. Pinson*, 584 F.3d 972, 978 (10th Cir. 2009) (holding when a habeas petitioner claims ineffective assistance of counsel, he impliedly waives attorney-client privilege with respect to communications with his attorney necessary to prove or disprove the claim).

[80] Doc 179-1 ¶ 1.

[81] *United States v. James*, 590 F.2d 575 (5th Cir. 1979), *partially overruled by Bourjaily v. United States*, 483 U.S. 171 (1987).

[82] Doc 179-1 ¶ 2.

[83] *Id.* ¶ 3.

To prepare for trial, Robinson states, he "expended tremendous amounts of time in evidentiary review" of the 2015 case charging Rios-Morales, Sifuentes, and nine other co-conspirators with drug trafficking conspiracy violations.[84]  He also had an associate attorney meet with Rios-Morales to review "every individual wiretapped phone call[]," but after reviewing a couple of calls, Rios-Morales refused to cooperate.[85]  Moreover, in questioning Sifuentes on cross-examination about the prior conspiracy at trial, Robinson states that he "walk[ed] a very fine line" to comply with the Court's *in limine* ruling.[86]

Robinson also addresses the juror parking lot incident.  He states that he made a strategic decision to allow the Court to interview the jurors *in camera*, concluding that any "fearful jurors" would feel more comfortable discussing any concerns with the Court outside the presence of Rios-Morales and his trial counsel.[87]  According to Robinson, "Rios-Morales was involved in the discussions of this legal strategy and after such consultation agreed to this process."[88]  Further, Robinson explains that he discussed the option of filing a motion for mistrial with Rios-Morales after the Court reported its findings to the parties.[89]  Robinson did not file a motion for mistrial because "Rios-Morales indicated that he was satisfied by the process and wanted to proceed with the jury trial."[90]

---

[84] *Id.* ¶ 4.

[85] *Id.*

[86] *Id.*

[87] *Id.* ¶ 5.

[88] *Id.*

[89] *Id.*

[90] *Id.*

### III.    Legal Standards

#### A.    Section 2255

Section 2255 entitles a federal prisoner to relief if the court finds that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or [is] otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack."[91] The court must hold an evidentiary hearing on a § 2255 motion "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."[92]  A § 2255 petitioner must allege facts that, if proven, would warrant relief from his conviction or sentence.[93]  An evidentiary hearing is not necessary where the factual allegations are contradicted by the record, inherently incredible, or when they are conclusions rather than statements of fact.[94]

#### B.    Ineffective Assistance of Counsel

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."[95]  A successful claim of ineffective assistance of counsel must meet the two-pronged test set forth in *Strickland v. Washington*.[96]  First, a defendant must show that his counsel's performance was deficient in that

---

[91] 28 U.S.C. § 2255(b).

[92] *United States v. Galloway*, 56 F.3d 1239, 1240 n.1 (10th Cir. 1995) (alteration in original) (quoting 28 U.S.C. § 2255(b)).

[93] *In re Lindsey*, 582 F.3d 1173, 1175 (10th Cir. 2009) (per curiam).

[94] *See Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir. 1995) ("The allegations must be specific and particularized, not general or conclusory."); *United States v. Fisher*, 38 F.3d 1143, 1147 (10th Cir. 1994) (rejecting ineffective assistance of counsel claims that are merely conclusory in nature and without supporting factual averments).

[95] U.S. Const. amend. VI; *Kansas v. Ventris*, 556 U.S. 586, 590 (2009).

[96] 466 U.S. 668 (1984).

it "fell below an objective standard of reasonableness."[97]  To meet the first prong, a defendant must demonstrate that the omissions of his counsel fell "outside the wide range of professionally competent assistance."[98]  This standard is "highly demanding."[99]  Strategic or tactical decisions on the part of counsel are presumed correct, unless they were "completely unreasonable, not merely wrong, so that [they] bear no relationship to a possible defense strategy."[100]  In all events, judicial scrutiny of the adequacy of attorney performance must be strongly deferential: "A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[101]  Moreover, the reasonableness of the challenged conduct must be evaluated from counsel's perspective at the time of the alleged error; "every effort should be made to 'eliminate the distorting effects of hindsight.'"[102]

Second, a defendant must also show that his counsel's deficient performance actually prejudiced his defense.[103]  To prevail on this prong, a defendant "must show that there is a reasonable probability that, but for his counsel's unprofessional errors, the result of the proceeding would have been different."[104]  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."[105]  This, in turn, requires the court to focus on "the

---

[97] *Id.* at 669.

[98] *Id.* at 690.

[99] *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986).

[100] *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000) (alteration in original) (quoting *Hatch v. Oklahoma*, 58 F.3d 1447, 1459 (10th Cir. 1995)).

[101] *Strickland*, 466 U.S. at 689.

[102] *Edens v. Hannigan*, 87 F.3d 1109, 1114 (10th Cir. 1996) (quoting *Strickland*, 466 U.S. at 689).

[103] *Strickland*, 466 U.S. at 687.

[104] *Id.* at 694.

[105] *Id.*

question whether counsel's deficient performance render[ed] the result of the trial unreliable or the proceeding fundamentally unfair."[106]

A defendant must demonstrate both *Strickland* prongs to establish a claim of ineffective assistance of counsel, and a failure to prove either one is dispositive.[107]  "The performance component need not be addressed first.  'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.'"[108]

## IV.    Discussion

Rios-Morales raises six discrete claims that his trial counsel was ineffective.[109]  The Court addresses each claim in turn.

### A.    Ground One: Trial counsel was ineffective for failing to request pretrial disclosure of expert testimony

Rios-Morales first contends that his trial counsel was ineffective for failing to request pretrial disclosure of Detective Kiger's expert testimony under Fed. R. Crim. P. 16(a)(1)(G). Rule 16(a)(1)(G) requires that the government provide the defendant a written summary of expert testimony the government intends to use under Fed. R. Evid. 702, 703, or 705 during its case in chief at trial, but only if specifically requested in writing by the defendant.  This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.  Rios-Morales's main complaint is that pretrial disclosure of Detective Kiger's expert testimony would have enabled trial counsel to make a *Daubert* challenge to the

---

[106] *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).

[107] *Smith v. Robbins*, 528 U.S. 259, 286 n.14 (2000).

[108] *Id.* (quoting *Strickland*, 466 U.S. at 697); *see also Romano v. Gibson*, 239 F.3d 1156, 1181 (10th Cir. 2001) ("This court can affirm the denial of habeas relief on whichever *Strickland* prong is the easier to resolve.").

[109] Rios-Morales withdrew his seventh Sixth Amendment claim alleging that the government intentionally intruded into his attorney-client relationship.  Doc. 175.

testimony.[110]  Rios-Morales also asserts that pretrial disclosure would have permitted him to object to Detective Kiger's expert testimony at trial, to prepare to challenge the testimony on cross-examination, and to retain his own expert to rebut the testimony.  Even if the Court assumes that the failure to request pretrial disclosure of Detective Kiger's expert testimony was objectively unreasonable, Rios-Morales cannot show prejudice.

First, Rios-Morales contends that pretrial disclosure of Detective Kiger's testimony would have permitted trial counsel to file a *Daubert* challenge to exclude Detective Kiger's expert testimony or to otherwise object "in some form or fashion."[111]  He argues that a *Daubert* challenge in this case would have been "likely successful."[112]  But Rios-Morales does not explain why Detective Kiger "did not, and likely could not," meet Fed. R. Evid. 702's standard of evidentiary reliability,[113] and therefore fails to plead this specific claim with particularity to the degree that an allegation of prejudice can be subject to scrutiny.[114]

Moreover, the Tenth Circuit has repeatedly held that law enforcement officers "can acquire specialized knowledge of criminal practices and thus the expertise to opine on such matters,"[115] so long as the testifying officers "explain how [their] experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."[116]  Here, the Court properly recognized Detective

---

[110] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

[111] Doc. 165 at 58–59.

[112] *Id.* at 57.

[113] *Id.* at 58.

[114] *See Cummings v. Sirmons*, 506 F.3d 1211, 1234 (10th Cir. 2007) ("[w]ithout a more precise identification of what [deficiencies defendant] is referring to," no prejudice can be demonstrated).

[115] *United States v. Garza*, 566 F.3d 1194, 1199 (10th Cir. 2009).

[116] *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014) (quoting Fed. R. Evid. 702 advisory committee's note (2000 Amendment)).

Kiger as an expert in the field of drug trafficking and controlled substances after he described his experience investigating drug trafficking crimes, his education, as well as interdiction courses and trainings he completed relating to drug trafficking crimes and methamphetamine.[117]

Detective Kiger's expert testimony described the modus operandi of drug traffickers, the value of methamphetamine quantities and purities, the language of drug dealers, the tools of the trade, and the general aspects of narcotics investigations.  The Tenth Circuit has long recognized that "[t]hese are not subjects with which most jurors are familiar," and the court has therefore permitted law enforcement officers to testify as experts concerning these subjects to assist the jury in understanding the evidence and determining facts in issue.[118]  Rios-Morales fails to show that raising a *Daubert* challenge before trial or objection at trial would not have been futile. Thus, Rios-Morales cannot show that trial counsel's failure to request pretrial disclosure of Detective Kiger's expert testimony prejudiced his defense.

Second, Rios-Morales argues that pretrial disclosure of Detective Kiger's expert testimony would have prepared trial counsel to raise other objections at trial, to more effectively cross-examine Detective Kiger, and to retain and call a rebuttal expert.  As an initial matter, Rios-Morales fails to show that any failure to object, to more effectively cross-examine, or to call a rebuttal expert was the product of trial counsel's failure to request pretrial disclosure of

---

[117] *See* Trial Tr. at 36–46; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 158 (1999) ("Rule 702 grants the district judge the discretionary authority . . . to determine reliability in light of the particular facts and circumstances of the particular case."); *United States v. McDonald*, 933 F.2d 1519, 1522 (10th Cir. 1991) ("The trial judge has broad discretion concerning the admission or exclusion of expert testimony.").

[118] *McDonald*, 933 F.2d at 1522.  While *United States v. McDonald* is a pre-*Daubert* decision, the Tenth Circuit specifically referenced *McDonald* almost two decades later when it explained: "[W]e do not believe that *Daubert* and its progeny (including the 2000 amendment to Rule 702) provide any ground for us to depart from our pre-*Daubert* precedents recognizing that [law enforcement] officers can acquire specialized knowledge of criminal practices and thus the expertise to opine on such matters . . . ."  *Garza*, 566 F.3d at 1199.  *See also United States v. Kamahele*, 748 F.3d 984, 998 (10th Cir. 2014) ("[W]e have long recognized that [law enforcement] officers can testify as experts based on their experience '[b]ecause the average juror is often innocent of the ways of the criminal underworld.'" (quoting *United States v. Garcia*, 635 F.3d 472, 477 (10th Cir. 2011))).

Detective Kiger's testimony rather than strategic decisions.[119]  Even if he did make this showing,

Rios-Morales does not specify which objections trial counsel was left unprepared to raise,[120] how

trial counsel's cross-examination of Detective Kiger could have been more effective,[121] or what

any rebuttal expert would have testified to.[122]  Without more than conclusory allegations, "it is

impossible to determine whether there is any merit to this argument."[123]  Accordingly, Rios-

Morales fails to establish any prejudice, and this claim is denied.

  **B.**  **Ground Two: Trial counsel was ineffective for failing to request a *James* hearing or to object to hearsay**

  Rios-Morales claims that trial counsel was ineffective for failing to seek a *James* hearing

or to object to the admission of out-of-court statements by individuals who did not testify at

trial.[124]  Under Fed. R. Evid. 801(d)(2)(E), co-conspirator statements are properly admitted into

evidence if, by a preponderance of the evidence, the trial court finds that (1) a conspiracy

existed; (2) both the declarant and the defendant against whom the declaration is offered were

---

[119] Indeed, decisions concerning which objections to raise, how to examine witnesses, and which witnesses to call at trial are all generally matters of trial tactics.  *See Yarrington v. Davies*, 992 F.2d 1077, 1080 (10th Cir. 1993) ("[m]ere failure to object to evidence does not render an attorney ineffective" because "[c]ounsel's actions are usually based on strategic choices"); *United States v. Snyder*, 787 F.2d 1429, 1432 (10th Cir. 1986) ("Counsel's selection of questions is a matter of strategic choice, as to which he has broad latitude." (internal quotation marks and citation omitted)); *Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008) ("[T]he decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney.").  Rios-Morales bears the burden of showing that trial counsel's actions were not based on valid strategic choices, *Bullock v. Carver*, 297 F.3d 1036, 1047 (10th Cir. 2002), and he fails to carry his burden.

[120] *See* Doc. 165 at 58 (referring generally to trial counsel's failure to "object to inadmissible evidence" and asserting that trial counsel "would likely have objected, in some form or fashion" if he had requested pretrial disclosure of Detective Kiger's expert testimony).

[121] *Id.* at 6 (stating that pretrial disclosure of Detective Kiger's expert testimony "would have permitted trial counsel to prepare to counter the testimony through . . . effective cross-examination").

[122] *Id.* (stating that pretrial disclosure of Detective Kiger's expert testimony would have allowed trial counsel to retain and call a rebuttal expert at trial).  To establish prejudice, a defendant must identify what the potential rebuttal expert would have testified to.  *Boyle*, 544 F.3d at 1138–30; *United States v. Hill*, 748 F. App'x 779, 782 (10th Cir. 2018), *cert. denied*, 140 S. Ct. 54 (2019).

[123] *See Cummings v. Sirmons*, 506 F.3d 1211, 1234 (10th Cir. 2007).

[124] *United States v. James*, 590 F.2d 575 (5th Cir. 1979), *partially overruled by Bourjaily v. United States*, 483 U.S. 171 (1987).

members of the conspiracy; and (3) the statement was made in furtherance of the conspiracy.[125] Under Tenth Circuit law, the district court may satisfy the prerequisite for admission of co-conspirator statements by holding a *James* hearing or by provisionally admitting the statements with the caveat that the government prove the existence of the conspiracy through testimony or other evidence.[126]  The preferred order of proof is first for the district court to hold a *James* hearing "outside the presence of the jury to determine by a preponderance of the evidence the existence of a predicate conspiracy."[127]  At a *James* hearing, the court may consider the hearsay statements sought to be admitted as well as independent evidence when making the requisite findings.[128]  The court has the discretion to consider any hearsay evidence not subject to privilege, regardless of whether or not that evidence would be admissible at trial.

Rios-Morales states that, "aside from Sifentes['s] testimony," statements by whom is believed to be Omar[129] and statements by other unidentified persons[130] "were the only evidence that went to demonstrating that [he] was involved in the conspiracy."[131]  He argues that "[m]ost, if not all, of these statements were unlikely to survive a *James* hearing" and "certainly would not have withstood an objection at trial."[132]

---

[125] *United States v. Johnson*, 911 F.2d 1394, 1403 (10th Cir. 1990).

[126] *United States v. Owens*, 70 F.3d 1118, 1123 (10th Cir. 1995).

[127] *United States v. Lopez-Gutierrez*, 83 F.3d 1235, 1242 (10th Cir. 1996) (quoting *United States v. Urena*, 27 F.3d 1487, 1491 (10th Cir. 1994)).

[128] *Bourjaily v. United States*, 483 U.S. 171, 179 (1987); *Johnson*, 911 F.2d at 1403.

[129] Rios-Morales refers to the statements made using a phone number ending in 9439.

[130] Rios-Morales refers to the statements of unidentified persons made using phone numbers ending in 0070, 6016, and 7369.

[131] Doc. 165 at 62.

[132] *Id.*

Trial counsel's decision to object to evidence is generally within the realm of trial strategy.[133]  Matters of strategy and tactics are significant in ineffective assistance claims because counsel's decisions in those areas "are presumed correct, unless they were 'completely unreasonable, not merely wrong, so that [they] bear no relationship to a possible defense strategy.'"[134]  Here, trial counsel did not seek a *James* hearing or object to the relevant hearsay statements at trial because he concluded that their admission was necessary to highlight inconsistencies in the government's timeline of events and to show that there was at least one other individual involved in the conspiracy.[135]  While this strategy ultimately proved unsuccessful, the Court should not second-guess trial counsel's chosen strategy simply because it fails.[136]  Additionally, trial counsel did move during trial to strike hearsay on several occasions.[137]  Thus, Rios-Morales fails to show that trial counsel's decisions could not be "considered sound trial strategy"[138] and fell outside "the wide range of reasonable professional assistance."[139]

Even if trial counsel was deficient for failing to seek a *James* hearing or to object to the admission of the hearsay statements, Rios-Morales cannot establish prejudice.  The government established the existence of a conspiracy, separate and apart from the co-conspirator statements

---

[133] *Yarrington v. Davies*, 992 F.2d 1077, 1080 (10th Cir. 1993).

[134] *Moor v. Marr*, 254 F.3d 1235, 1239 (10th Cir. 2001) (alterations in original) (internal citation omitted) (quoting *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000)).

[135] Doc 179-1 ¶¶ 2–3.

[136] *See Strickland*, 466 U.S.668, 689 (1984) ("Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.").

[137] *See, e.g.*, Trial Tr. at 553; *id.* at 534; *see Yarrington*, 992 F.2d at 1080 (noting that trial counsel, "on at least one occasion, did move to strike hearsay," and concluding that the defendant thus failed to "overcome the presumption that counsel's failure to object at other times may have been trial strategy").

[138] *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

[139] *Id.*

identified by Rios-Morales, through its witnesses and evidence at trial.  Thus, even if trial

counsel had asked for a *James* hearing or objected at trial to the admission of the hearsay

statements, Rios-Morales fails to show that the government would not have prevailed.  Because

trial counsel's decision was not objectively unreasonable or prejudicial, this claim is denied.

### C.        Ground Three: Trial counsel was ineffective for failing to review discovery

Rios-Morales claims that trial counsel was ineffective for failing to review discovery

concerning the prior conspiracy involving Rios-Morales and Sifuentes that spanned October

2012 to January 2014.  Rios-Morales alleges that "the 2015 case was likely to contain evidence

that would impeach Sifuentes[]," the government's "most important witness."[140]  He argues that

trial counsel's alleged failure is the "functional equivalent" of a total failure to conduct pretrial

discovery, which prejudiced his defense because any evidence that could undermine Sifuentes's

credibility "was critical to [his] defense."[141]  Rios-Morales points to two pieces of evidence

relating to the California trips that trial counsel could have used to impeach Sifuentes.  First,

Rios-Morales avers, trial counsel could have impeached Sifuentes's testimony that he took his

last trip to California in April 2013 with evidence that he made at least two trips to California

after that date.  Second, trial counsel could have impeached Sifuentes with evidence that he was

dishonest with his family about his whereabouts and an extramarital affair.

Rios-Morales's claim is not supported by the record.  Trial counsel "flatly denies" Rios-

Morales's allegation, stating that he "expended tremendous amounts of time in evidentiary

review of [the 2015 case]" and even had an associate attorney meet with Rios-Morales to review

every wiretap recorded phone call but Rios-Morales refused to cooperate.[142]  Rios-Morales offers

---

[140] Doc. 165 at 63.

[141] *Id.* at 63–64.

[142] Doc 179-1 ¶ 4.

no evidence that suggests otherwise.  More importantly, trial counsel did seek to impeach Sifuentes with evidence that he had returned to California after the third trip, despite testifying that the third trip was the last.[143]  Trial counsel suggested that this could have been "a lie that he[] [was] telling his wife or him and his wife [were] concocting."[144]  As the record of the sidebar conversation makes clear, however, trial counsel "walk[ed] a very fine line" to comply with the Court's *in limine* ruling.[145]  The Court reminded trial counsel that the three trips to California—and only those three trips—comprised "the universe" of evidence of California trips admitted under Fed. R. Evid. 404(b).[146]  Thus, trial counsel "ha[d] to be cautious" and avoid a line of questioning that went into areas related to the other ongoing criminal cases that the government instructed Sifuentes not to talk about to "stay within the parameters of the ruling."[147]  Eliciting evidence about any additional trips would, as the Court repeatedly warned trial counsel, have "opened the door."[148]  Under these circumstances, the Court cannot find that trial counsel failed to review evidence concerning the prior conspiracy, and trial counsel's performance did not fall below an objective standard of reasonableness.

### D.     Ground Four: Trial counsel was ineffective for failing to object, cross-examine, and challenge the government's case

Rios-Morales alleges broadly that trial counsel "was unprepared to challenge the accuracy of the Spanish translations, or to effectively challenge other evidence, including the credibility of the key witnesses, for lack of investigation, preparation, or basic knowledge of the

---

[143] *See* Trial Tr. at 1107–08.

[144] *Id.* at 1107.

[145] Doc 179-1 ¶ 4.

[146] Trial Tr. at 1108.

[147] *Id.* at 1111–12.

[148] *Id.*

law."[149]  Instead of introducing material facts, Rios-Morales requests an evidentiary hearing on this issue.[150]

Rios-Morales is only entitled to an evidentiary hearing if he alleges facts that, if proven, would entitle him to relief.[151]  "The allegations must be specific and particularized, not general or conclusory."[152]  Here, Rios-Morales makes only conclusory allegations, and is therefore not entitled to an evidentiary hearing on this matter.  And because Rios-Morales alleges no more than conclusory allegations, he has not shown that he received ineffective assistance of counsel at trial.  This claim is denied.

### E.    Ground Five: Trial counsel's absence from the *in camera* juror interviews violated Rios-Morales's Sixth Amendment right to the assistance of counsel

Rios-Morales complains that he was constructively denied his Sixth Amendment right to the assistance of counsel when the Court questioned jurors *in camera* outside the presence of counsel after one or more of the jurors reported a suspicious individual in the juror parking lot observing vehicles.  The Court conducted the interviews to determine whether the jurors had been tainted by the incident at trial counsel's suggestion.  Rios-Morales now claims that trial counsel should have requested to be present at the interviews, and that trial counsel's absence amounted to a deprivation of his Sixth Amendment right to counsel.  In support, he invokes *United States v. Cronic*[153] and argues he need not show prejudice to establish a Sixth Amendment violation.

---

[149] Doc. 165 at 65.

[150] *Id.* ("[Rios-Morales] is prepared to expand and elaborate . . . at an evidentiary hearing on this matter.").

[151] *See Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir. 1995).

[152] *Id.*

[153] 466 U.S. 648 (1984).

In *Cronic*, the Supreme Court recognized a narrow exception to *Strickland* and "identified three situations implicating the right to counsel that involved circumstances 'so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.'"[154]  The first situation is "the complete denial of counsel."[155]  In this situation, prejudice is presumed if an accused is denied counsel during a critical stage of trial.[156]  In the second situation, prejudice is also presumed if "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing."[157]  Finally, in the third situation, the presumption of prejudice is appropriate where "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is [] small."[158]

Rios-Morales argues that his case falls under *Cronic*'s first situation—the complete denial of counsel during a critical stage of trial.[159]  *Cronic* observed that the Supreme Court has "uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding."[160]  Where counsel is denied during a critical stage, the defendant need not show prejudice because the adversarial process itself has become presumptively unreliable.[161]  This

---

[154] *Bell v. Cone*, 535 U.S. 685, 695 (2002) (quoting *Cronic*, 466 U.S. at 658–59).

[155] *Id.* (quoting *Cronic*, 466 U.S. at 659).

[156] *Id.*

[157] *Id.* at 696 (quoting *Cronic*, 466 U.S. at 659).

[158] *Cronic*, 466 U.S. at 659–60.

[159] *See* Doc. 165 at 67.

[160] *Cronic*, 466 U.S. at 659 n.25.

[161] *Id.* at 659 ("The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial.").

*Cronic* situation is rare—"only once in the thirty-plus years since *Cronic* has the Court applied the presumption of prejudice it described in a critical-stage case."[162]

### 1.    Critical Stage

The Supreme Court has defined "critical stages" as steps of a criminal proceeding that hold significant consequences for the accused.[163]  As such, a defendant "is entitled to counsel at any proceeding where an attorney's assistance may avoid the substantial prejudice that could otherwise result from the proceeding."[164]  Relying on *Gomez v. United States*,[165] Rios-Morales asserts that "[q]uestioning the jury is one of those stages."[166]  But the Supreme Court in *Gomez* identified *voir dire* as a critical stage of trial;[167] it said nothing about *in camera* communications between judge and juror after the jury has been selected.  Rios-Morales raises no concern about the jury-selection process.

Absent clear direction from the Supreme Court, the circuit courts have struggled to define the "critical" stages of trial during which the absence of counsel warrants the presumption of prejudice.[168]  And the Supreme Court has never determined whether an *in camera* juror interview to investigate potential bias is a "critical stage" for Sixth Amendment purposes.  It is clear, however, that the trial court has broad discretion to determine how to assess and respond to

---

[162] *Schmidt v. Foster*, 911 F.3d 469, 479 (7th Cir. 2018) (citing *Penson v. Ohio*, 488 U.S. 75, 88 (1988) (finding a presumption of prejudice where the defendant lacked counsel for appeal)).

[163] *Bell*, 535 U.S. at 695–96.

[164] *United States v. Collins*, 430 F.3d 1260, 1264 (10th Cir. 2005) (citing *Coleman v. Alabama*, 399 U.S. 1, 9 (1970)).

[165] 490 U.S. 858 (1989).

[166] Doc. 165 at 66.  The government does not address this issue.  In fact, the government makes no mention of *Cronic* and assesses Rios-Morales's claim under *Strickland*.

[167] *See Gomez*, 490 U.S. at 872–73.

[168] *See United States v. Russell*, 205 F.3d 768, 771 (5th Cir. 2000) (collecting cases).

allegations of juror bias.[169]  Whether a juror can remain impartial is "a matter of fact uniquely within the observation of the trial court."[170]  Accordingly, the trial judge "typically, and quite properly," initially acts independently "to investigate and address" allegations of juror bias.[171]  Further, it is neither uncommon nor unusual for counsel to agree to have the judge interview jurors outside the presence of counsel to investigate potential bias.[172]  As trial counsel in this case recognized, the defense's presence alone at these discussions can be counterproductive.[173]  Thus, it is unclear whether the *in camera* juror interviews on the facts of this case amount to a "critical stage" for Sixth Amendment purposes.  But the Court need not decide whether this case presents a critical stage because, assuming *arguendo* that it does, the Court is not persuaded that Rios-Morales was so deprived of counsel as to warrant *Cronic*'s presumption of prejudice.

## 2.    Complete Denial of Counsel

Rios-Morales takes issue with trial counsel's absence during the *in camera* juror interviews, arguing that trial counsel's absence "for the duration of the Court's *in camera* interviews" meant he effectively "had no lawyer."[174]  But, critically, he overlooks the context in which the interviews took place.  Consider the Supreme Court's decision in *Estelle v. Smith*,[175] where the trial judge ordered a psychiatric examination of the defendant without notice to his counsel.[176]  The psychiatric examination "proved to be a 'critical stage'" of the proceedings

---

[169] *United States v. Santiago*, 977 F.2d 517, 522 (10th Cir. 1992) (citing *United States v. Bradshaw*, 787 F.2d 1385, 1389 (10th Cir. 1986)).

[170] *United States v. McVeigh*, 153 F.3d 1166, 1185 (10th Cir. 1998).

[171] *Santiago*, 977 F.2d at 522.

[172] *See, e.g.*, *United States v. Wacker*, 72 F.3d 1453, 1467 (10th Cir. 1995).

[173] *Santiago*, 977 F.2d at 522–23; *Luman v. Champion*, 108 F.3d 1388 (10th Cir. 1997) (unpublished); *United States v. Gagnon*, 470 U.S. 522, 527 (1985) (per curiam).

[174] Doc. 165 at 67.

[175] 451 U.S. 454 (1981).

[176] *Id.* at 470–71.

against the defendant because the prosecution later used information obtained from the examination to persuade the jury to impose the death penalty.[177]  The Supreme Court held that the examination violated the defendant's Sixth Amendment right to the assistance of counsel.[178]  However, as the Seventh Circuit has observed, the Supreme Court "did not take issue with the counsel's absence *during* the critical stage."[179]  Rather, the Court found that the defendant was denied the assistance of counsel because he was unable to consult with his counsel *before* the critical stage, "in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed."[180]

In this case, the record makes clear that Rios-Morales did not suffer a complete denial of counsel, "on par with total absence,"[181] so as to invoke *Cronic*'s presumption of prejudice.  Rios-Morales had complete access to counsel in deciding how the Court should handle the juror parking lot incident.  Prior to speaking with any of the jurors, the Court discussed the juror parking lot incident with the parties to seek suggestions on how the Court should proceed.  And it was at trial counsel's suggestion that the Court conducted the *in camera* juror interviews.  Trial counsel's absence was strategic: "[t]he legal strategy was that these purportedly fearful jurors would be more open to freely discuss any issues or concerns with Judge Robinson outside the presence of Mr. Rios-Morales and his trial counsel."[182]  He discussed this strategy with Rios-Morales, who agreed to proceed accordingly.[183]  Thus, trial counsel advocated for Rios-Morales,

---

[177] *Id.* at 470.

[178] *Id.* at 471.

[179] *Schmidt v. Foster*, 911 F.3d 469, 482 (7th Cir. 2018).

[180] *Estelle*, 451 U.S. at 471.

[181] *Wright v. Van Patten*, 552 U.S. 120, 125 (2008) (per curiam).

[182] Doc 179-1 ¶ 5.

[183] *Id.*

conferred with him, and made a strategic decision to be absent during the *in camera* juror interviews.

Following the interviews, the Court summarized its findings to the parties and concluded there was no taint because no juror expressed a belief that the person in the juror parking lot was related to Rios-Morales or the case.  The Court then heard from trial counsel, who expressed no remaining concerns and no need for further questioning.  In his affidavit, trial counsel states that he discussed the option of filing a motion for mistrial with Rios-Morales, and Rios-Morales "indicated that he was satisfied by the process and wanted to proceed with the jury trial."[184] Rios-Morales therefore enjoyed the advice, understanding, and advocacy of trial counsel with respect to the juror parking lot incident not only in deciding to have the Court interview the jurors *in camera* outside the presence of counsel but also in deciding how to proceed after the Court concluded the interviews.

*Cronic*'s presumption of prejudice is "reserved for situations in which counsel has entirely failed to function as the client's advocate."[185]  Save for the judge's *in camera* juror interviews themselves, conducted at his suggestion, Rios-Morales had complete access to counsel.  No Supreme Court precedent suggests that *Cronic*'s presumption of prejudice should apply in such circumstances.  Accordingly, this claim does not merit habeas relief.

> **F.      Ground Six: Trial counsel was ineffective for failing to request a jury instruction defining the term "possession"**

Count One charged that Rios-Morales, along with Sifuentes, possessed and attempted to possess methamphetamine with the intent to distribute it.  While the jury instructions defined "possession with intent to distribute," the instructions did not define the term "possession" itself.

---

[184] *Id.*

[185] *Florida v. Nixon*, 543 U.S. 175, 189 (2004).

Rios-Morales claims that trial counsel's failure to request a jury instruction defining "possession" was objectively unreasonable because:

> The law recognizes two kinds of possession: actual and constructive.  The evidence at trial was unequivocal that Mr. Rios-Morales never actually possessed the methamphetamine.  Nor was there strong evidence that Mr. Rios-Morales was in constructive possession of the methamphetamine, since Sifuentes[] testified that the methamphetamine was intended for him, not Mr. Rios-Morales.  And that Mr. Rios-Morales recoiled away from the methamphetamine when Sifuentes[] showed it to him.[186]

Rios-Morales asserts that the jury was "plainly confused about Count One, evinced by the question it relayed during deliberations about the meaning of 'possession.'"[187]  The jury had asked whether "physically possessing is necessary" to convict Rios-Morales of Count One,[188] and trial counsel agreed to have the Court direct the jury to the instructions already given.  Rios-Morales argues that if trial counsel had requested an instruction defining "possession," the jury "would likely have concluded that [he] was not guilty of Count One—a different outcome."[189]  The Court finds that Rios-Morales fails to establish either *Strickland* prong.

Rios-Morales fails to show that trial counsel's failure to request an instruction defining "possession" was not trial strategy.  The defense theory articulated throughout trial was that Rios-Morales neither possessed nor attempted to possess the methamphetamine at issue because the methamphetamine was not his—it belonged to Sifuentes.  The Tenth Circuit's pattern jury instructions provide that "possession" can be actual or constructive: "A person who, although not in actual possession, knowingly has the power and intent at a given time to exercise dominion or control over an object, either directly or through another person or persons, is then in

---

[186] Doc. 165 at 68 (citation omitted).

[187] *Id.* at 69 (citing Doc. 84).

[188] Doc. 84.

[189] Doc. 165 at 69.

constructive possession of it."[190]   A request for an instruction alerting the jury that it could find Rios-Morales possessed the methamphetamine even though he never took actual possession of it could have been inconsistent with trial strategy.  Thus, trial counsel's performance was not objectively unreasonable.

It is also worth noting that there is no requirement that the jury instructions define every relevant term.  In the plain error context, the Tenth Circuit has held that no special definition is required where a term "carries its natural meaning" and is "commonly understood," and "possession" is one such term.[191]   Rios-Morales argues that the jury's question about the term "possession" indicates that the jury did not understand the term.  A jury, however, "is presumed to follow its instructions [and] . . . is presumed to understand a judge's answer to its question," including, as here, an answer directing the jury's attention to the jury instructions already given.[192]   If the jury was still confused and needed additional information after reading the Court's written response, the jury would have submitted another question.[193]

Moreover, Rios-Morales can show no prejudice.  To convict Rios-Morales under Count One, the government needed to prove that he possessed the methamphetamine with the intent to distribute it, *or* that he attempted to possess the methamphetamine with the intent to distribute it, *or* that he aided and abetted another in the commission of the crime.[194]   Here, Rios-Morales fails

---

[190] 10th Cir. Crim. Pattern Jury Instructions No. 1.31 (2018).

[191] *United States v. Robinson*, 435 F.3d 1244, 1249–50 (10th Cir. 2006) (citing *United States v. Garza-Juarez*, 992 F.2d 896, 910 (9th Cir. 1993), for the proposition that "possession" does not have such a "technical or unfamiliar meaning[] that failure to define [it] in jury instruction constitutes plain error"); *see also United States v. Shannon*, 809 F. App'x 515, 523 (10th Cir. 2020) ("After *Robinson*, we specifically declined to find plain error when a court did not provide an instruction defining 'constructive possession.'" (citing *United States v. Knight*, 659 F.3d 1285, 1292–93 (10th Cir. 2011))).

[192] *Weeks v. Angelone*, 528 U.S. 225, 234 (2000).

[193] *Id.*

[194] *See* Doc. 83, Instrs. 12, 14.

to establish that requesting a jury instruction defining "possession" would have altered the verdict on Count One.

First, and despite his contrary assertion, the jury could reasonably find that Rios-Morales constructively possessed the methamphetamine at issue.  "Constructive possession is established when a person, though lacking . . . physical custody, still has the power and intent to exercise control over the object."[195]  Here, Rios-Morales initiated the conspiracy by offering to introduce Sifuentes to a new source of supply, his brother Omar.  After discussing Omar's new plan to load methamphetamine onto a car in California and transport the car on a commercial car hauler to Kansas, Rios-Morales "asked him if [they] could do this for the last time" because he needed money to go to Mexico.[196]  They agreed to move forward with the plan and discussed the logistics, including who would pick up the car and where it would arrive.  Omar arranged for the bill of lading to list Rios-Morales's address as the place of delivery.  Then, when Sifuentes called to say he was in the parking lot of Rios-Morales's apartment complex with the car, Rios-Morales walked out to meet Sifuentes.

On these facts, the jury could reasonably infer that Rios-Morales had the power and intent to exercise control over the methamphetamine in the car, particularly in light of the Fed. R. Evid. 404(b) evidence the jury heard about Rios-Morales's involvement in the earlier conspiracy. Rios-Morales alleges that he "recoiled away from the methamphetamine" when Sifuentes showed it to him, indicating that he did not constructively possess the methamphetamine.[197]  But given Sifuentes's testimony that Rios-Morales asked him to hide the methamphetamine when he

---

[195] *Henderson v. United States*, 135 S. Ct. 1780, 1784 (2015); *United States v. Little*, 829 F.3d 1177, 1181–82 (10th Cir. 2016); *see also* 10th Cir. Crim. Pattern Jury Instructions No. 1.31 (2018).

[196] Trial Tr. at 1181.

[197] Doc. 165 at 68.

showed it to Rios-Morales because Rios-Morales thought it was too dangerous,[198] the jury could reasonably infer that Rios-Morales "recoiled away" simply out of fear of getting caught.  And while Rios-Morales argues that the evidence establishing constructive possession was not "strong,"[199] it is the role of the jury, and not the Court, to weigh the evidence in reaching the verdict.

Second, the jury could reasonably find that Rios-Morales attempted to possess the methamphetamine at issue.  In order to prove an attempt, the government needed to establish that Rios-Morales intended to commit the crime and that he took a substantial step towards commission of that crime.[200]  The facts outlined above supporting a finding that Rios-Morales constructively possessed the methamphetamine at issue also reasonably show that Rios-Morales intended to possess the methamphetamine with the intent to distribute it and that he took a substantial step towards committing the crime.  Indeed, he took several steps towards committing the crime, including introducing Sifuentes to Omar, asking Sifuentes to agree to the new plan, and meeting Sifuentes in the parking lot by the car containing the methamphetamine.

Third, Rios-Morales's conviction under Count One did not necessarily hinge on a finding of possession or attempted possession; the jury could simply find Rios-Morales guilty of aiding and abetting.[201]  The aiding and abetting theory of liability "allows a jury to hold an aider and abetter responsible for the substantive offense to the same extent as a principal, even though his act was not the cause of the substantive harm."[202]  The jury instructions for aiding and abetting in

---

[198] Trial Tr. at 1042.

[199] Doc. 165 at 68.

[200] Doc. 83, Instr. 15.

[201] *Id.*, Instr. 14.

[202] *United States v. Bowen*, 527 F.3d 1065, 1078 (10th Cir. 2008).

this case required the government to show that Rios-Morales "knowingly and deliberately associated h[im]self in some way with the crime charged and participated in it with the intent to commit the crime."[203]  "Intentionally aiding, counseling, or assisting another in the commission of a crime is all that is required."[204]  "Even mere 'words or gestures of encouragement' constitute affirmative acts capable of rendering one liable under this theory."[205]  Thus, the jury in this case needed only to find Rios-Morales "guilty of aiding and abetting, not the substantive crime itself."[206]

Here, the jury could reasonably find that Rios-Morales intentionally associated himself with the crime and participated in it with the intent to commit the crime.  Again, Rios-Morales initiated the conspiracy at issue by offering to introduce Sifuentes to a new source of supply, his brother Omar.  And after Sifuentes and Rios-Morales discussed the new plan to transport methamphetamine from California to Kansas in a car on a commercial car hauler, Rios-Morales asked Sifuentes to agree to the plan so he could pay for a trip to Mexico.  Thus, even if the jury could not reasonably find that Rios-Morales constructively possessed or attempted to possess the methamphetamine at issue, it could reasonably find him guilty of aiding and abetting. Accordingly, this claim fails.

### G.    Cumulative Error

Finally, Rios-Morales asserts that the alleged cumulative errors entitle him to federal habeas relief.  The cumulative-error doctrine applies in the federal habeas context only where

---

[203] Doc. 83 at 17.

[204] *Bowen*, 527 F.3d at 1078.

[205] *Id.* (quoting *United States v. Whitney*, 229 F.3d 1296, 1303 (10th Cir. 2000)).

[206] *United States v. Gabourel*, 692 F. App'x 529, 545 (10th Cir. 2017).

there are two or more actual constitutional errors.[207]  Because the Court has found no constitutional error, let alone multiple errors, Rios-Morales's cumulative error argument fails.

## V.      Certificate of Appealability

Under Rule 11 of the Rules Governing Section 2255 Proceedings, the court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.[208]  A certificate of appealability may issue only if the applicant has made a substantial showing of the denial of a constitutional right.[209]  To satisfy this standard, the movant must demonstrate that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[210]  For the reasons stated above, the Court finds that Rios-Morales has not satisfied this standard and, therefore, denies a certificate of appealability as to its ruling on his § 2255 motion.

**IT IS THEREFORE ORDERED BY THE COURT** that Petitioner Jose Rios-Morales's Motion to Vacate and Discharge with Prejudice Under 28 U.S.C. § 2255 (Doc. 165) is **denied** without an evidentiary hearing, and Rios-Morales is **denied** a certificate of appealability.

**IT IS SO ORDERED.**

Dated: November 19, 2020

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE

---

[207] *Jackson v. Warrior*, 805 F.3d 940, 955 (10th Cir. 2015) (citing *Thacker v. Workman*, 678 F.3d 820, 849 (10th Cir. 2012)).

[208] The denial of a § 2255 motion is not appealable unless a circuit justice or a district judge issues a certificate of appealability.  Fed. R. App. P. 22(b)(1); 28 U.S.C. § 2253(c)(1).

[209] 28 U.S.C. § 2253(c)(2).

[210] *Saiz v. Ortiz*, 392 F.3d 1166, 1171 n.3 (10th Cir. 2004) (quoting *Tennard v. Dretke*, 542 U.S. 274, 282 (2004)).